STUART N. ROBINS,                    )
                                     )
        Plaintiff/Appellant,         )
                                     )      Appeal No.
                                     )      01-A-01-9612-CV-00550
VS.                                  )
                                     )      Davidson Circuit
                                     )      No. 94C-3589
FLAGSHIP AIRLINES, INC. and,         )
AMR CORPORATION,                     )
                                     )
        Defendants/Appellees.        )

**FILED**

June 20, 1997

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE CIRCUIT COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE WALTER C. KURTZ, JUDGE

DOUGLAS S. JOHNSTON, JR.
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, Tennessee 37201
        Attorney for Plaintiff/Appellant

WEYMAN T. JOHNSON, Jr.
KELLY J. KOELKER
MAUREEN E. O'NEILL
600 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 38308-2222

WAVERLY D. CRENSHAW, JR.
BRIAN A. LAPPS, JR.
511 Union Street, Suite 2100
Nashville, Tennessee 37219
        Attorneys for Defendants/Appellees

AFFIRMED AND REMANDED

BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
LEWIS, J.

# O P I N I O N

The trial judge granted summary judgment to the employer on the employee's claims of breach of an employment contract, common law retaliatory discharge, and violation of Tenn. Code Ann. § 50-1-304. On appeal the employee argues that there are factual disputes as to what motivated the employer to fire him and that the employer is not entitled to a judgment as a matter of law. The company asserts that the state claims have been preempted by federal law. We affirm the judgment below.

## I.

Stuart N. Robins went to work for Air Midwest in Wichita, Kansas in 1986 as an aircraft mechanic. He transferred to Nashville in 1987, and later that year, Nashville Eagle, Inc. acquired the Nashville operations of Air Midwest. Nashville Eagle, Inc. later became Flagship Airlines, Inc.

In 1990 Mr. Robins became a salaried management employee with the title of maintenance supervisor. He admits, however, that he was at all times an employee-at-will. On November 5, 1993, Flagship terminated Mr. Robins, allegedly for the mismanagement of the company's petty cash fund which was in his custody.

Mr. Robins filed this action claiming that his termination violated an implied agreement in his employment contract, and that his firing was in retaliation for his threat to reveal that the company falsified routine maintenance reports. The company asserted that the state claims have been preempted by federal law.

## II.

## Preemption

The trial court did not reach this issue, and we have determined that it is not necessary for us to do so either. Since we have found that the employer is entitled to a judgment as a matter of law on the state claims, we decline to decide the issue of preemption.

## III.

## The Contract Claim

Mr. Robins asserts that an employee handbook contractually bound his employer to work with him to correct any offensive behavior; that termination could be imposed only after the employee failed to satisfactorily respond to programs designed to help him. He argues, therefore, that even if he had been guilty of mishandling the petty cash entrusted to him, the company had agreed not to fire him for that transgression but to work with him to correct the unacceptable performance.

The facts in the record, in the light most favorable to Mr. Robins, *see Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), show that in 1990 when Mr. Robins was promoted to maintenance supervisor, he received a handbook entitled "Peak Performance Through Commitment - A Handbook for Supervisors." The handbook, repeating a program that appeared in an earlier employee handbook, outlined a policy of "working with" employees whose job performance or conduct was unacceptable; it specifically disclaimed any policy of punishment for such employees. It did, however, reserve the company's right to fire an employee who commits an act that calls for immediate termination. One of the acts described as grounds for dismissal was: "Dishonesty of any kind in relations with the company."

- 3 -

The employee handbook also contains the following specific policy regarding termination:

> The Company reserves the right to terminate employment at any time without advance notice, its only obligation being to pay wages or salary earned by an employee to date of termination. Without limitation, failure to abide by company rules and regulations, poor performance, failure to pass any company physical examination, and the falsification or omission of any information given on an application will entitle the Company to terminate employment.

In addition, the Supervisor's Handbook had this provision:

> Every situation is unique and therefore a supervisor must exercise judgment in dealing with a particular problem. The procedures outlined here are generally applicable, but the supervisor retains the authority and the responsibility for dealing with specific problems in specific ways dictated by the circumstances of the case.

We fail to see how the various handbook provisions can be construed to provide a restraint on the employer's right to terminate its employees. At most, the handbook(s) announce a policy of employee help to improve substandard performance. The bottom line, however, is a specific reservation of the right to terminate employees at any time -- a right that is compatible with at-will employment. See *Medley v. A.W. Chesterson Co.*, 912 S.W.2d 748 (Tenn. App. 1995).

## IV.

### Retaliatory Discharge

Mr. Robins alleged in his complaint that his employer fired him because he was about to go public with information that the company falsified important maintenance records concerning its airplanes.

In support of its motion for summary judgment the company introduced evidence that the reason it terminated Mr. Robins was the mismanagement of a $200 petty cash fund under his control, which was to be kept in a secure place on company

premises. When the company conducted an audit of the account, it found that Mr. Robins had $100 on his person, and he said $100 was "at home." Mr. Robins explained the breach of company policy by saying that there was no secure place at work to keep the money.

In opposition to the motion Mr. Robins offered evidence that on August 21, 1993 his shift was to conduct a functional check of the oxygen pressure system on one of the company's airplanes. The check was to be performed in accordance with work card 1323 which required a piece of equipment the company did not have. Mr. Robins declined to conduct the test and submitted a requisition for the necessary equipment. Later, he discovered that another employee had conducted the test and had filled out card 1323 as if all of the card's requirements had been complied with. The same thing happened on subsequent occasions. Mr. Robins did not report his observations to the FAA. He did discuss the procedure with the company's director of maintenance control, who explained that the test could be performed without a test unit.

On August 29, 1993, Mr. Robins sent a letter to the president of Flagship Airlines, Inc. in which he repeated a complaint about his personal pay and he outlined some concerns about problems in the maintenance department. He did not, however, mention the incident concerning card 1323, nor did he express an opinion that the company was in violation of FAA rules or that it was engaged in illegal activities. Mr. Robins' pay dispute and his concerns about the maintenance department were of long duration, and he had worked his way up the company chain of command with his complaints.

On October 20, 1993, Mr. Robins elevated his sights and sent a similar letter to the president of AMR Corporation, the owner of Flagship Airlines. The letter followed closely the same arguments made in the August letter. All but one paragraph

of the letter was devoted to the pay issue. The other paragraph did relate to problems in the maintenance department but it did not mention anything illegal nor did it refer to the oxygen test incident, nor to card 1323. The final paragraph of the October 20 letter concludes:

> Mr. Crandall, if my letter to you follows the company's general behavior up to this point, I don't expect I will receive a response from you, and I'm not going to be waiting for one. I am already seeking counsel on the pay issues and am preparing to bring these issues before the media. I am not relaying this to you in the company standard of propaganda or intimidation, just as a fact. And just so you know -- I realize this puts me in a very precarious position in regards to my future with this company, but then again, the way I see it there is no more future with me in this company. You cannot give me what I aspire for in regards to anyone I would rely on for my livelihood.

On October 31, 1993 a surprise audit revealed that Mr. Robins' petty cash fund was not being handled in accordance with company policy. A superior relieved Mr. Robins of his responsibilities and sent him home. He was terminated on November 5, 1993.

In Tennessee the Supreme Court has recognized a cause of action for retaliatory discharge where the employer violates a clear public policy in discharging an at-will employee. *Chism v. Mid-South Milling Co., Inc.*, 762 S.W.2d 552 (Tenn. 1988). The Court first announced its rule in *Clanton v. Cain-Sloan, Co.*, 677 S.W.2d 441 (Tenn. 1984), where the employee was allegedly fired for exercising her rights under the worker's compensation statutes. In *Hodges v. Toof*, 833 S.W.2d 896 (Tenn. 1992), the Court allowed an action for punitive damages for discharging an employee for extended jury duty. In *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822 (Tenn. 1994), the Court said the discharge must violate a strong public policy as expressed in an "unambiguous constitutional, statutory, or regulatory provision."

In 1988 the legislature passed an act giving employees a cause of action for retaliatory discharge where the employer discharges or terminates an employee "solely for refusing to participate in, or for refusing to remain silent about, illegal activities." See Tenn. Code Ann. § 50-1-304.

We are convinced that there is no proof in the record from which a trier of fact could infer that Mr. Robins' termination gave him either a common law or statutory cause of action for retaliatory discharge. His letters to company management following the August 21 incident with card 1323 do not mention the incident nor do they hint that the company is involved in illegal activities. They continue to press Mr. Robins' claims for back pay and insist that the maintenance department is poorly run, but they do not even approach the subject of statutory or regulatory violations. And, finally, the only threat to go public concerns the pay dispute -- hardly an illegal activity.

An essential element of Mr. Robins' cause of action for retaliatory discharge is missing. Under the rules governing summary judgment as outlined in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), summary judgment against him was proper.

The judgment of the court below is affirmed and the cause is remanded to the Circuit Court of Davidson County for any further proceedings that may become necessary. Tax the costs on appeal to the appellant.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____

- 7 -

HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
SAMUEL L. LEWIS, JUDGE